No. 28.—EUGENIUS A. NISBET, and others, plaintiffs in error, *vs.* JOEL WALKER, defendant in error.

[1.] A judgment creditor, upon a usurious contract, comes into a Court of Equity seeking to have his debt satisfied out of the money in the hands of the assignees, arising from the sale of the insolvent's property, upon which he had a lien at law, which he waived. Consenting to the sale upon the assurance of the trustees, made in ignorance of the usury, that his claim should be paid, *Held,* that the usury may be set up by way of answer to the bill—provided a sufficient excuse be rendered why the original debtor did not avail himself of

this defence at law; and if sustained by proof, the judgment shall be displaced for the usury, and stand only against the *trust fund*, for the principal and legal interest due on the original loan.

In Equity in Bibb Superior Court.   Decided by Judge FLOYD.

His Honor, Judge NISBET, being a party in this cause, did not preside during the argument, nor give any opinion upon it.

The facts are set out at length in the opinion of the Court.

POE & POWERS, for the plaintiffs in error, contended:

1st. That a Court of Equity will lend its aid in favor of a *defendant* against whom a judgment has been rendered on a usurious contract, provided defendant had no notice of the usury pending the action.   But on the following terms, viz: That he pays the principal, with legal interest.   *Lansing vs. Edy*, 1 *Johns. Ch. R.* 47, 50.   *Rogers vs. Rathbun, ibid*, 367.   *Tupper vs. Powell, ibid*, 439.   *Kenan & Rockwell vs. Miller*, 2 *Kelly*, 329.   *Williams vs. Lee*, 3 *Atk.* 223.   2 *Pr. Wm.* 425.

The above authorities refer to cases in which the party oppressed seeks to be relieved in a Court of Equity.   But, when the lender of money on a usurious contract seeks to enforce his usurious judgment in a Court of Equity, and the defendant sets up and establishes the charge of usury, the Court will decide according the letter of the statute, and deny all assistance, or, at all events, will only aid the complainant to the extent of the principal debt. *Fanning vs. Durham*, 5 *Johns. Ch. R.* 122.   2 *Bro. Ch. Rep.* 642. *Scott vs. Nisbet*, 2 *Hill (S. C.) Ch. Rep.*   *Pickett vs. Pickett*, 470. 1 *Kelly's Rep.* 409.   1 *Fonb. Eq.* 25. 139, 140, *n.*

In examining the majority opinion of Chancellor Johnson, in 2 *Hill's Ch. Reports*, it will be found that the cases relied on in support of that opinion do not support it.   1 *Murphy's Rep. Branton vs. Dixon*, 225.   In which it is expressly admitted that the plaintiff showed no reason for his neglect in not insisting upon the plea of usury at law.   Also the case in 2 *Bro. Ch. Rep.*

A defendant may plead to a *scire facias*, brought to revive a decree which was obtained against him by default, that the original contract was usurious.   *Lane vs. Ellzey*, 4 *Hen. & Mun.* 504. 4 *Mun. Rep.* 66.

A Court of Equity never assists a creditor who has been guilty of usury. *Bly on Usury*, 125. 1 *Deav. & Bat. Ch. Rep.* 50. See *Chancellor Gaston's remarks.*

ROBERT V. HARDEMAN, for defendant in error.

The counsel for the defendant in error makes the following points, and rely on the authorities cited.

1st. That the bill in Equity filed by Walker was not filed to unforce the contract on which Walker's judgment was predicated, but it was filed to enforce a subsequent and separate trust agreement entered into between the Messrs. Nisbet and Walker, untainted with usury, and founded on a sufficient and valuable consideration, by which Walker waived the lien of his judgment at law as to the negroes belonging to Mr. Hines, one of the defendants to the judgment, by consenting to the sale of said negroes by the trustees, and thereby enabled them to convey good titles to the purchasers discharged of the judgment lien. The non-compliance with the stipulations contained in this agreement on the part of the Messrs. Nisbet, forced Walker to apply to a Court of Equity to obtain his rights, under said agreement, against the Messrs. Nisbet, and against whom relief alone is prayed in the bill as to this branch of the case. No relief is prayed against Mr. Hines. None can be obtained on this agreement against him— he is a nominal party—he need not have been made a party.

As to the validity and consideration of the agreement, see *Chitty on Contracts*, 29, *also Note I, same page, and Note II, on page* 33. 20 *Wendell*, 184. 12 *Mass. Rep.* 268. And as to Hines being a party, see *Story's Equity Pleading*, 216, 229, 231, 542.

2d. That the judgment of Walker against Lane, Bails & Hines, having been rendered by a Court of competent jurisdiction, that judgment, *until reversed*, is conclusive in every other judicial tribunal in Georgia, as to all parties and privies thereto, and no evidence tending to impeach that judgment is admissible in any other judicial tribunal in the State in any subsequent distinct controversy between the parties. 1 *Phillips on Evidence*, 333. 4 *Phillips, in note, by Cowen & Hill, page* 830. *Hoyt vs. Gelston*, 13 *Johns. Rep.* 153. *Maxwell vs. Conner*, 1 *Hill's Ch. Rep.* 22. *French vs. Shotwell*, 6 *Johns. Ch. Rep.* 235. *Bostwick vs. Perkins, et al.*, 1 *Kel-*

*ly's Rep.* 138, 139. *Stroup vs. Sullivan & Black,* 2 *Kelly's Rep,* 279, 280. *Kenan & Rockwell vs. Miller,* 2 *Kelly's Rep.* 329. *Blydenburg on Usury,* 112, 122, 123. *Pickett vs. Pickett,* 2 *Hill's Ch. Rep.* 473, &c. The Messrs. Nisbet are privies in estate, 1 *Phil.Ev.* 321.

3d. That no judgment regularly obtained in a Court of competent jurisdiction can be set aside by attacking it in an answer to a bill in Equity, as is sought in the present case. It must be reversed by some proceeding instituted directly to procure its reversal. The usual way in Georgia is by a new trial, writ of error, arrest of judgment, or a bill of injunction for a new trial. 2 *Story's Eq. sec.* 862, *page* 156 ; *sec.* 887, *page* 174.

JNO. G. MCHENRY, for the defendant in error, contended:

1st. That a judgment, (even though erroneous,) is conclusive until reversed. 1 *Kelly,* 136. 2 *ibid.* 281, 329.

2d. That a judgment in "invitum" upon a usurious contract, cannot be displaced until reversed, and that a Court of Chancery will not set the same aside for matter which could have been and should have been pleaded to the original cause of action. . 3 *Johns. Ch. Rep.* 356. 6 *ibid,* 89. 15 *Mass. Rep.* 451. 3 *Porter,* 436. 7 *ibid,* 553. 3 *Kelly,* 78.

3d. A judgment is only to be impeached, (when the same is made by a Court of competent jurisdiction,) by a direct proceeding in course of appeal, and cannot be done collaterally. 1 *Johns. Ch. Rep.* 543. *Ibid.* 91. 5 *ibid,* 325. 5 *Litt.* 304. 1 *ibid.* 140. 3 *Atkins.* 630, 223. 1 *B. & H. Dig.* 677. *I. C. R.* 396.

4th. That the bill, in the present case, is filed to enforce the engagement between the assignees and the plaintiff in execution, and it is not competent for the defendant, upon the hearing of the same, to set up usury in the original cause of action, and prove the same. 2 *Hill Ch. Rep.* 471.

*By the Court.*—LUMPKIN, J. delivering the opinion.

On the 19th day of March, 1844, Joel Walker filed his bill in the Superior Court of Bibb co., against Eugenius A. Nisbet, James A. Nisbet, Augustus S. Wingfield and Richard K. Hines, wherein he states that on the 8th of December, 1841, the said Richard K. Hines executed a deed of conveyance to the said Eugenius A.

Nisbet vs. Walker.

Nisbet and James A. Nisbet—a copy of which is annexed to the bill—whereby, in consideration of his being justly indebted to certain persons therein named, and being rendered by misfortune unable to pay them in the usual way, in consideration of the sum of five dollars, as well as for the purpose of making a just distribution of his estate amongst his creditors, did assign and convey unto the said Eugenius A. and James A. Nisbet, all of his estate, both real and personal, (a particular enumeration of which is made in the instrument,) *in trust*—that they should take said property into their possession, and should sell and dispose of the same in the most beneficial manner, and as soon as may be practicable, apply the proceeds, after deducting the expenses, to the payment of the debts due the persons, and in the order specified in the deed: *First*, to all judgments then open against him; *Second*, whatever balance may be due to the firm of Nisbet, Hines & Blake, for collections made by him as a member of said firm; *Third*, the debts due North, Manning & Patrick—to the Marine and Fire Insurance Bank—to the Central Bank of Georgia—to Green H. Jordan and Miss Mary Nisbet, being honorary and confidential debts. That the said Eugenius A. and James A. Nisbet accepted the *trust* and took said property, both real and personal, into their possession, and on the      day of      , 1842, did expose to public sale, in the City of Macon, all or nearly all of the Negroes and their increase, which sale amounted to $30,000, or other large sum, and did, on that day and before and since, sell and dispose of nearly all of said real estate, amounting to $35,000, or some other large sum, and that they received the ready money therefor. That the complainant was one of the creditors for whose benefit and advantage the assignment was made, holding as he did a judgment open and unsettled against the said Richard K. Hines and one James T. Lane and one Emmon Bails, obtained in Baldwin Superior Court, and bearing date on the first day of October, 1840, for the sum of $4,689,40, principal and judgment interest for $255 30, with costs. That said judgment was of older date than any other against the said Richard K. Hines, and was entitled to be paid in preference to any other lien of any kind whatever. That before the said sale was made by the said Eugenius A. and James A. Nisbet, he notified them of its existence, and refused to permit said sale to take place until his judgment should be satisfied—that the said Eugenius A. who was the

active trustee in managing said trust, assured complainant that the sale was to be made in good faith, and that the money would be promptly applied to the extinguishment of complainant's judgment—that the whole object of the assignment was to save expense, and to enable him, the said Eugenius A. to relieve himself from his liabilities for the said Richard K. That in consideration of these solemn assurances, and the confidence complainant reposed in the fidelity of the said trustees, he did permit the sale to proceed. That the said Eugenius A. and James A. Nisbet did both state publicly, that the property was to be sold under the assignment, and that the money would be applied, first to judgments and then to other liens, according to date, and that the assent of all the creditors had been obtained to that effect. The bill further charged, that the trustees had not applied the proceeds of the sale of the property in pursuance of the provisions of the deed, but had appropriated them fraudulently and illegally, and to persons and in a manner not authorized by the assignment. That after the sale complainant applied to the trustees, to have his judgment paid pursuant to the trust confided to them, and that they informed him that the property had been sold for bills on the Central Bank of Georgia, which were then at a great depreciation, but promised him that if he would receive a part of his debt in that kind of money, that they would in a very few days pay him the balance of his judgment, in good specie-paying Bank Bills; that they were attempting to convert the depreciated bills into the latter kind, and urged him to extend this indulgence to them—inasmuch as they, and especially the said Eugenius A. had assumed great liabilities for the said Richard K.; and unless he could get time to make the most advantageous arrangements, he should be very seriously injured. That feeling every desire to render such service, and if possible, enable the trustees to escape all loss, he consented to receive five hundred dollars in bills of the Central Bank, but when he applied for the same, the trustees refused to comply with their proposition, and made new and different proposals, to wit : that if complainant would take fifteen hundred dollars in Central Bank bills, they would pay the balance in specie funds. To this last proposition complainant acceded, and on the 24th of June, 1842, the trustees paid to him fifteen hundred dollars in Central Bank bills for exchange, or bills on time, which would fall due about the 15th day of the next

month, (July,) when the residue would be promptly met. That when the time came, he applied to the said Eugenius A., who informed him that the bills had not been promptly met, and that he had been compelled to grant indulgence or give time upon them, until the first of October following, at which time the money would certainly be ready to be paid to him; at which time, when it arrived, the said Eugenius A. informed him that the money was still uncollected. All of which shifts and practices the bill charges to be untrue, and designed only for delay, and that the truth was, that the money had been illegally paid out to other judgments and liens of younger date than that of complainant. That the trustees had paid off a large amount of debts, for which one or both of them were bound for the said Richard K. Hines, and which were not intended to be paid off before complainant's judgment, according to the terms of the trust. That they had paid to North, Manning & Patrick, six thousand dollars, or other large sum; to the Marine & Fire Insurance Bank—to the Central Bank—to Miss Mary Nisbet, and to the firm of Nisbet, Hines & Blake, fifteen thousand dollars, or other large sum of money, which claims were to be postponed by the terms of the deed of assignment, until complainant's debt was satisfied; and that they have still in hand a large sum of money, for which they have not accounted at all to any one. That finding it was in vain to rely upon the promises of payment made by the trustees—and finding the river plantation unsold, he caused the same to be levied upon by his *fi. fa.* and on the first Tuesday in January, eighteen hundred and forty-three, it was sold and sacrificed at the trifling sum of one hundred dollars, and the money paid over to a judgment in favor of the Central Bank of Georgia, against said Richard K. Hines, of older date than that of complainant's; and upon which one of the said trustees was the attorney—and which, complainant has been informed and believes, has long since been paid off and discharged, and which was satisfied, or ought to have been satisfied a long time previously, out of the property of the said Hines. That the river plantation was purchased in by Augustus S. Wingfield, of the county of Bibb, who was an agent sent to said sale, to buy the same, if practicable, for the said trustees; and that now, when complainant applies to the said trustees, to be paid his judgment, they reply that they cannot pay it, and especially the said Eugenius A., but that if he will accept the river plantation in discharge

of his debt, which they allege to be worth some five thousand dollars, they will get the control of Mr. Wingfield at what he gave for it, and who is willing to allow them to use it in this way, for the benefit of the said Richard K. Hines—though at the same time, they deny that any one but Mr. Wingfield is the owner of said land ; whereas complainant insists that Mr. Wingfield merely acted as the agent of the trustees in the transaction, and that the property yet belongs to Hines, and that it was paid for with the money arising from the sale of Hines' property, which should have been applied to the extinguishment of complainant's debt. The prayer of the bill is, that the defendants may answer the premises and abide the decree which may be finally rendered on the hearing : that the trustees may exhibit all their actings and doings as such, that they may set forth the amount of property received by them under the deed of assignment—the amount sold and to whom sold, and the price of each article ; that they may be compelled to account to and with the complainant, touching their conduct and proceedings as trustees, and be decreed to pay complainant the amount due him on his judgment, as required by said deed of trust; that the deed made to Wingfield for the land in Dooly, be delivered up and cancelled, and that said land may be fairly sold, and the proceeds applied to complainant's judgment, and that he may have such other relief as shall seem meet and agreeable to equity.

To this bill, Eugenius A. and James A. Nisbet, two of the defendants, made in substance, the following joint answer, which was sworn to by them respectively, on the 28th day of February, 1845 : They admit it to be true, that Richard K. Hines executed the deed of assignment set forth in the bill, and under the circumstances and for the purposes therein specified. That they are the near relations of the said R. K. Hines, and that both of them were endorsers for him to a large amount, and that these reasons constituted the inducements to them to accept the troublesome and unpleasant trust created by the deed of assignment. They believed at the time it was executed, that Mr. Hines' estate, with prudent management, would be sufficient to pay all his debts ; but that in this belief, as the result proved, they were greatly mistaken. They considered it most beneficial to all parties, to sell the negroes at public sale. To this the consent of the judgment creditors of Hines was indispensable, and they accordingly procured

the consent of all of them, except the assignee of a judgment in favor of Harrison Jones vs Hines—the complainant, Joel Walker, being one of them, his consent was asked and given to the sale of the negroes. That after being duly advertised, all of the negroes, except Dan, were sold at the Court House door in the city of Macon, at high prices. That Dan was privately sold the same day, for $1150, being, as they believe, his full value ; and that all the negroes there sold, including Dan, brought the sum of $20,600, and not $30,000, as charged in the bill. The currency of the State at the time of the sale in 1842, being greatly deranged, and scarcely any money in circulation on specie-paying banks, and specie funds being at a considerable premium, and in fact, almost impossible to be procured—and the bills of the Central Bank constituting almost entirely the circulation of the State, the trustees believed that it was the interest of the creditors of Mr. Hines, to sell the property for Central Bank money, which was at the time, below par, and going from 5 to    per centum ; and accordingly, notice was given that the negroes would be sold for Central Bank money, or specie funds, the purchaser being allowed the current premium on specie funds, who might pay in such funds. The sum of $19,712 was raised in Central money, and $888 in specie funds, or in amounts nearly as stated, respectively, and they have no doubt that the negroes brought more, after taking from the amount of sales the discount upon the Central money, and the premium upon the specie funds, than they would have sold for on any other plan. The defendants admit the judgment of Walker, and that it is one of the oldest against Hines, and that they had notice of it before the sale, and that the complainant was assured that the sale was in good faith, and that the proceeds of the sale and all the property assigned, should be applied to the payment of the debts, according to the provisions of the deed. They also admit, that on the day of sale, notice was given that the proceeds would be applied to the payment of the debts, in the order specified in the assignment, and that they would have been so applied, but for the reasons hereafter rendered. That after the agreement made with complainant that his debt should be paid, and after the sale, but on the same day, as well as they can recollect, they were notified by Hines, the assignor, and one of the defendants in the complainant's judgment, that the contract which was the foundation of said judgment, was usurious, and were required by Hines

not to pay the same. And further, that he had only a few days before, or on that day, ascertained for the first time, that it was usurious. After receiving the notice, they were still willing to pay said judgment, rather than subject themselves and Mr. Hines to the expense and trouble and vexation and reproach of contesting it upon the ground of its being usurious. This willingness to pay it was founded on a belief, too, that there would be no difficulty in making the effects pay all the judgments. Consequently, they, or particularly the respondent, Eugenius A. Nisbet, did tell the complainant that his judgment would be paid, and urged him to wait until all the money could be made available, and the effects disposed of, assuring him that effects would be reserved sufficient to pay him; and he did, from time to time, consent to wait until matters could be thus arranged. In consequence of the loss on the Central Bank bills, and the premium on the specie funds, and the exaction of all the judgment creditors that they should be paid in specie funds or their equivalent in Central Bank money, they ascertained finally, after delay and expense, in using all practicable means to realize the least possible loss upon the money, that the amount of the sales would not pay all the judgments by several thousand dollars, which were open against R. K. Hines at the time of the assignment; and in consequence of this deficiency, the complainant having from time to time consented to wait, they had left only $1500 to pay him, which was accordingly done, and his execution credited with that sum. Under the notice which they had received, not to pay complainant's debt, they did not feel at liberty to withhold the money in hand, from *other* judgment creditors, and apply it to his. On the contrary, they believed it their duty to pay it out as soon as possible, to other judgment creditors; still, in good faith, and in pursuance of their promise to Mr. Walker, they did reserve from the effects assigned to them, the valuable plantation designated as the River Place, in the county of Dooly, containing twelve hundred acres, more or less, and which was then, and is yet, in their opinion, worth what is due on his judgment, for the purpose of paying his judgment. They fulfilled their undertaking, by reserving effects enough to pay him, and have not to this day disposed of that plantation.— They deny wholly, any wish or design to defraud the complainant out of one cent, or to withhold what the law or their obligation, as trustees, would require them to do. They well knew, and

so did the complainant, that his judgment lien attached on all the real estate of Mr. Hines. His consent to the assignment extended only to the sale of the negroes, and he did not at any time, waive his lien upon the lands, for he afterwards, as will more fully appear, levied his execution upon both the plantations in Dooly county, to satisfy his judgment. The defendants could not, therefore, if they had been willing to do so, have defeated his judgment. It was their intention to have sold the River Plantation, and to have applied the proceeds to complainant's judgment, and used every effort in their power to do so, but such was the state of the times—such was the immense depreciation in the value of property, and the scarcity of money, that they could not effect a sale of that plantation but upon terms the most ruinous to the interest of Mr. Hines, and disastrous to Mr. Walker himself, and such terms as they believed their duty as trustees would not permit them to take. The complainant growing impatient, ordered a levy upon the large plantation in Dooly county, called in the deed of Assignment, the Pond Place, embracing eleven hundred acres, more or less, and upon which the lien of his judgment attached—and the same was ultimately brought to sale, and the complainant, as they are informed and believe, wholly neglected the sale, suffering the property to be sold for a nominal sum. He also caused the River Plantation to be levied upon and brought to sale. One of the respondents, Eugenius A. Nisbet, finding him determined to levy, pointed out the property, and fearing that this large interest might be sacrificed, caused an agent to attend the sale with instructions to bid off the property, if it was likely to be sacrificed, and with no other view but to save it for the benefit of their *Cestui que trust.* And the result was, the property was sold for the nominal sum of $112, or some other small sum, the complainant not being in attendance, as they were informed and believe, nor had he any agent there, but wholly neglected it. The title to the plantation thus sold, was made to A. S. Wingfield, Esq., at their request, by the Sheriff of Dooly county. They deny that this purchase was made for their benefit, and on the contrary, answer—that at their own expense, and advancing the money out of their private funds, they thus caused the same to be purchased, to save this valuable part of the effects for the use and benefit of their *Cestui que trust,* and in discharge, as they understood them, of their obligations as trustees. Being so-

licitous to pay complainant's debt, they have made repeated ef forts since the sale of the River Plantation, to resell it and apply the proceeds to his judgment, and they verily believe that they could have sold it for a fair price, but for the fact that the complainant had caused a general want of confidence in the titles, by making it known that he had a judgment whose lien attached upon it, and by having it levied on as herein stated. And they now answer, that they have offered to cause the said plantation to be conveyed to the complainant, in payment of his judgment, and he has declined to receive it; and now they hold the same subject to be applied to the payment of whatever may be deemed to be due on the judgment of complainant by this honorable Court. They further answer, that the nett proceeds of the sale of the property assigned to them, after deducting all losses and expenses, which amounted to upwards of $600, was paid to judgments outstanding against R. K. Hines, at the time of the assignment, and in accordance with the provisions of the deed. That is to say, they paid to the State Bank judgment the sum of $9,119 79, $7,350 of which was paid in Central Bank money, at 5 per cent. discount, and the balance in a check on Savannah. To a judgment in favor of L. M. Wiley, $6,806 12, which was paid in bills on Savannah; and this sum includes premiums on the bills and costs on the executions. To a judgment in favor of Harrison Jones, specie funds, principal, interest and cost, $1,379 66. To Joel Walker's judgment, $1,570 00. This judgment was paid—$1000 in specie funds, and $570 in Central Bank bills, making a credit on his judgement of $1500. To a judgment in favor of J. Hammond, in specie funds, $1000. To B. Trapp, cost on judgments, $115 87, making in all, the sum of $20,091 44. The balance of the sale of the negroes, to-wit : $508 56, was more than consumed in costs of the sale, in executing the assignment, and in procuring specie funds. Indeed, all of the sum of $508 56 was expended in realizing the amount paid in specie funds. The defendants state, that no other money has come to their hands, than the foregoing amount. They conveyed to North, Manning & Patrick, the body of land described in the deed as the Pond Place, and the lots in Early and Sumpter Counties, in extinguishment of debts due by the assignor to that firm and to the Marine and Fire Insurance Bank, amounting together to the sum of $12,500. The land described as the River Plantation they yet

hold under the circumstances set forth in their answer. And the lot of land No. 3, 5th District of Dooly, and the lots lying in Appling county and Cherokee, they have not been able to dispose of The Baker and Mississippi lands are under a mortgage to the Bank of Milledgeville, to secure a debt due to that institution, which lien is older than the assignment. The Equity of Redemption conveyed to them by the deed, they have mortgaged to the Central Bank, to secure a large debt due to that institution by R. K. Hines. As to its value, they are uninformed. It is not believed by them to be worth much. They admit that the money arising from the sale of the Dooly land was applied to a judgment in favor of the Central Bank, which was older than Walker's, and which they deny to have been paid off and kept open fraudulently. Nothing has been paid from the effects assigned them, either to the firm of Nisbet, Hines & Blake, or either of them, or to Miss Mary Nisbet.

On the same day, to-wit: the 28th day of February, 1845, Augustus S. Wingfield filed his separate answer to the Bill of complainant. He admits it to be true, that he attended the sale of the River Plantation in Dooly County, at the solicitation of the Messrs. Nisbet, and with instructions to buy in the same for them, provided it did not bring a reasonably fair price, and for the purpose, as they alleged, of preventing it from being sacrificed; and he was furnished with written authority—but when the day of sale arrived, he, finding it impossible to attend, forwarded the power to A. A. Morgan, Esq., with similar directions to those he had received from the principals, which was done, and he delivered the deed executed to him, to the Messrs. Nisbet, or one of them. Not being personally present, he cannot state as to what occurred at the sale. James A. Nisbet paid the purchase money, $112. He disclaims having any interest in the property, having consented to take the deed for the purpose of saving the valuable property, for the benefit of the creditors of Mr. Hines, in obedience to the wishes of the assignees.

On the third day of March, 1845, R. K. Hines filed his separate answer to the complainant's bill. He admitted the execution of the deed of assignment. He states that Walker's judgment was founded upon a note of Lane & Bails, as principals, and indorsed by him, but that he had no knowledge whatever of its existence until it fell due. The principals used in this transaction, a blank slip, indorsed by him, (and left with Lane,) without the knowledge or consent of the de-

fendant.   On the day of sale, he was informed by one John Ham-
mond, who was a judgment creditor, that Walker's judgment was
founded on a usurious agreement between him and Lane and
Bails.   He immediately applied to Walker to know whether the
information was true or false, who replied—"Mr. Hines, I would
rather you should get your information from some one else;"
which refusal to answer, satisfied the defendant that the transac-
tion was tainted with usury.   He at once called upon his as-
signees and notified them not to pay this claim, until it could be
ascertained how much of it was properly due.   And he felt it an
act of justice to his other creditors to adopt this course, as he was
apprehensive that the whole of his estate might prove insufficient
to pay his just debts.   He has since obtained from Lane & Bails
the following information, which he believes to be true : that about
the sixth of May, 1839, James Lane, being hard pressed for funds, ·
applied to complainant, or his agent, John Breedlove, who agreed
to lend him $5000 from that time until the 25th of December
thereafter, if Lane would give him his note for that sum, well se-
cured or indorsed, and agree to pay interest thereon, from the first
day of January, 1839, being four months before the money was
loaned, if he did not pay punctually the note, and would also give
him $800 for the loan of said sum, till the time aforesaid; all of
which was done.   That shortly after the note fell due, $700 was
paid upon it, which was first applied to the extinguishment of the
interest, which had accrued from the first of January, 1839, ma-
king the balance of the principal of the judgment, $4,689 40, and
$255 30, interest on that balance, from the payment of the $700
to the date of the judgment.   He alleges that he was an accommo-
dation indorser only, and in no wise interested in or benefitted by
said loan, and that Lane & Bails are wholly insolvent.   And this
defendant, after setting out the plea of usury technically, in his
answer, submits whether this judgment shall be allowed to be
paid any more than the balance of principal due thereon, after de-
ducting the payments from the original loan.   He confirms the
statements in the answers of his co-defendants, as to the sale of the
River Plantation in Dooly.   On the 12th of May, 1847, Hines
filed an amended answer, in which he states as a reason why he
did not set up the plea of usury at the time the judgment was re-
covered, that the note was fraudulently filled up, as stated in his
original answer, and put in circulation without his knowledge;

Nisbet *vs.* Walker.

and that the existence of usury in the contract never came to his knowledge until after the judgment was obtained.

This cause came on for trial before Judge Floyd, on the 18th day of November, 1847, upon the Bill and answers and exhibits. The defendants admitted that the execution in favor of L. M. Wiley and the Bank of the State of Georgia, and upon which the Messrs. Nisbet were indorsers for R. K. Hines, against whom judgments had been obtained, were younger than Walker's, and had been paid off out of the Trust fund. The complainant having closed his case, the defendants offered the interrogatories of Emmon Bails, in evidence, which were withdrawn. John Hammond was then offered to prove that on the day of the sale of the negroes under the assignment, that he informed Hines of the usury in the judgment against him in favor of complainant. This testimony was objected to and repelled by the Court, upon the ground that the judgment in favor of the complainant was conclusive until reversed, and that it could not be thus impeached, by setting up in the answer to the bill, matter of defence which existed before the rendition of the judgment. The interrogatories of Emmon Bails were again tendered to prove the usury in the judgment of Walker, as charged in the answer of Hines, and ruled out for the same reasons. To which decisions, defendant's solicitors excepted; and they urged then, as they do now—

1st. That inasmuch as the complainant was proceeding in Chancery, to enforce his judgment at law, it was competent for the defendant Hines, to prove usury in the note, which was the foundation of the judgment, and insist on it in his answer, and show it on the trial, and that a Court of Equity would not lend its aid to enforce an unconscientious demand, though carried to judgment.

2d. That the Court erred in holding that said judgment was conclusive until reversed, and that Hines could not set up the usury by way of defence in this proceeding.

3d. That the Court erred in rejecting the testimony which was offered to show the ignorance of Hines at the time of the judgment, as to the existence of the usury in the original contract.

[1.] In this minute recapitulation of the facts, nothing is omitted which is material to a clear comprehension of the case, as made by the record. And what, let me ask, is that case? It is *not*, I humbly conceive, that which is discussed in the first proposition of complainant's counsel. He there assumes, that the Bill is not

filed to enforce the judgment, but the *agreement* made with the Messrs. Nisbet on the day of sale, and repeatedly ratified and re-affirmed by them afterwards; and which was, that in considera-tion of withholding his lien, and consenting to the sale, that he should be paid his money. True, this undertaking is set out in the Bill, and admitted in the answers; and we shall invoke its aid for the purpose of giving direction to the Decree, which we are about to render. Still, it is manifest from the whole tenor of the Bill, as well as the prayer, that it is not brought to compel a compliance with this contract. It is filed against R. K. Hines, and the Messrs. Nisbet, as his *Trustees ;* it institutes a rigid scru-tiny into their conduct and proceedings, as *Trustees*; and claims to be paid out of the *trust fund*, in accordance with the provisions of the *trust deed.* And in this view alone, and in no other, was it either necessary or proper, to have made Hines, the original debtor, a party.

I am not prepared to say that this agreement between Walker and the Messrs. Nisbet, might not have been enforced. I am in-clined to think that it could have been. True, it was by *parol*, and to pay the debt of a *third person.* Still it arises out of a new and original consideration of both benefit and harm moving be-tween the parties. The *benefit* to the Messrs. Nisbet was a more advantageous sale of the property, thereby increasing the proba-bility of their being relieved as indorsers for Hines; and the *prej-udice* to Walker was the postponement, indeed I may say, the to-tal abandonment of his Common Law lien upon the property sold. It is not then, a case within the Statute of Frauds. 1 *Comyn on Con.* 13. , 8 *Johns.* 37. 4 *Cowen*, 434. 6 *Halsted*, 78.

How far Walker may have precluded himself from pursuing this agreement on account of his subsequent attempt to collect the original debt out of the property of Hines, it is needless now to express any opinion. I must think also, that Counsel for Com-plainant have misapprehended the nature and object of the de-fence. It is not to invalidate or set aside the judgment of Walk-er. If that were so, the wrong parties are before the Court. To such a proceeding neither Wingfield nor the Messrs. Nisbet would be proper parties; and to such a proceeding the original co-defendants, Messrs. Lane & Bails, would be indispensable par-ties. The judgment against them will not be affected at all by

the result of this case.    How far it will be displaced as to Hines himself, I am not'prepared to say.

Having ascertained then, negatively, what the case made by this record is *not*, we will state affirmatively, what we conceive it to be. Here is a fund in the hands of the Messrs. Nisbet, as the assignees of R. K. Hines, and a judgment creditor of Hines seeks to have his debt satisfied out of it.    It is made known to the Trustees that the claim is infected with usury; and that fact is brought before the Court by the answers of the defendant to the creditor's bill.    Is there any principle, either of law or equity, which would forbid an examination into this demand, provided a proper case is made by the pleadings to authorize it?    By reference to the decision of the ·presiding Judge, it will be seen that he refused to allow this enquiry to be made, not because the proper foundation was not laid in the answers of the defendants to warrant it; but because it was presented by way of answer to the Bill, and not in an original proceeding, instituted directly for that purpose.    We have not been able to bring our minds to approve of this view of the subject.

It is, I know, a well established principle, that equity will not relieve against a judgment at law, on the ground of usury, where the facts were available to the defendant, before the rendition of the judgment.    Still, if it appear, that without neglect or fault on his part, he was ignorant of the usury, not only pending the suit, but until after the judgment was obtained, he may avail himself of this defence.    In Campbell *vs.* Morrison, (7 *Paige,* 162,) Chancellor Walworth says: " In this case, as the complainant had been deprived of his defence at law, by the neglect of the principal debtor to inform him, until after the judgment, that the defence of usury existed, I presume the Supreme Court would have permitted him to come in and make his defence, as indorser of the note upon the payment of the amount actually loaned, with interest and the extra costs occasioned by his neglect to make the defence in an earlier stage of the suit.    And under the circumstances of the case, a Court of Equity ought not to interfere, upon any other terms, even if the Supreme Court would not have permitted complainant to make his defence there."

Here is a precedent precisely in point, both as to this being a suitable case for equitable relief, and likewise to the terms upon which it will be granted.    Hines, it will be remembered, was the

the indorser upon the note which is the foundation of Walker's judgment. It was filled up without his knowledge, and contrary to his intentions—his name having been left on a blank slip of paper with Lane for a different object. He never knew of the existence of the note until its maturity, nor of the usury until after judgment. He brings himself clearly, then, within the exception to the rule, which denies relief in equity against a judgment at law, unless the defendant was ignorant of the fact in question, pending the suit. It is indispensable to justice, that a party who is ignorant of the character of the original transaction, should be allowed the privilege of opening the judgment. Nor has any good reason been rendered, or authority cited, to show that this cannot be done in the way here proposed.

*Pickett vs. Pickett,* 2 *Hill's Ch. Rep.* 470, has been relied on in opposition to this course. That case decides nothing but this— namely : that on a Bill by one judgment creditor against another, to set aside a Sheriff's sale of the debtor's property as fraudulent, and to recover funds which defendant had fraudulently obtained, it was held by a *majority* of the Court, that the defendant could not avail himself of usury in the original cause of action, on which the plaintiff's judgment was founded. Chancellor Harper and Jus- tices Gantt and O'Neall dissented even from this opinion. But with it I have no controversy, inasmuch as it does not apply to the case be- fore us. I am disposed to side with the majority of the Court, and to hold that the borrower, neglecting to make his defence at law, that a judgment *fairly* obtained against him, upon a usurious contract, is *conclusive*—and that he cannot himself, neither *can his creditors* evade the effect of this omission, directly or indirectly; or make it the ground of application for relief to a Court of Equity, either by way of plea or answer, or in an original proceeding commenced for that object.

But neither this Court, nor any other, so far as I am informed, have ever held either that the debtor himself or his assignees, might not impeach a judgment tainted with usury, under the cir- cumstances of the case at bar. In *Scott & Nisbet,* 2 *Bro. Ch. R.* 502, the contest was before the Master in Chancery, for the dis- tribution of an insolvent's funds. The Chancellor ruled, that re- lief might be obtained against a usurious judgment *in this way,* as well as by Bill filed against the judgment creditor. Does it make any difference whether the defence of usury be set up in

the answer to a Bill filed to enforce the *original contract*, or the *judgment* in which it is merged ? · With this difference, *Beach vs. the Fulton Bank* is very similar in many of its features to the case under consideration. There, one of the grounds assumed, was, that the defendants being *trustees*, could not set up this objection, · and especially as they admitted by their answers that they had funds on hand sufficient to pay the debt. But Chief Justice Savage, who delivered the opinion of the Court, says : " This ground is certainly *not* tenable. The defendants to the Bill are some of them the *original debtors*, and some are *creditors* as well as *makers* of these notes, and also *Trustees*. As Trustees, they are to pay other creditors, and ought not to pay any illegal demands; perhaps they would·not be bound to set up this defence, but there can be no doubt they are not bound by their obligation as *Trustees*, to pay notes which have no legal efficacy, and are perfectly justified in availing themselves of such a defence, as if they were individually interested." 3 *Wend. R.* 584.

The doctrine affirmed by the Court in this case, is—" that whoever seeks the aid of the equitable powers of a Court of Chancery, must do equity, and that the defendants in this case, like all other defendants, may rely upon usury, either by way of answer or plea, and prove the usury." *Ibid.*

It only remains to settle upon what terms the debtor himself, or his assignees, are to be let into this defence. Now, it is a mistake to suppose that the complainant comes here to set up his usurious contract. He has already obtained a judgment on that which bound the property of his debtor. He comes here insisting on the satisfaction of his judgment lien, out of the money in the hands of the *Trustees*, by virtue of the assignment. Hence the doctrine in Fonblanque, and other writers on equity, that a usurious lender coming into Chancery, seeking to enforce his contract, will be refused any assistance, does not apply. It is the defendants, who propose by their answer, to cut down this judgment to the original sum loaned, abating the payments. They are the party seeking relief against the usurious contract; and calling upon the Court for the exercise of its extraordinary powers, to extricate them from the force and effect of this judgment. Consequently, it is for them to be willing to do equity. And it is perfectly immaterial whether the borrower is plaintiff or defendant—the application of the principle is the same. The Court will

not aid him unless he will do what is right, and that is, to pay, or offer to do so, what is really and *bona fide* due, deducting the usurious interest. 5 *Johns. Ch. R.* 142. *Vernon* 170, 173. 1 *T. R.* 153.

A Court of Equity is not positively bound to interfere in such cases, by an active exertion of its powers ; but has a discretion on the subject, and may prescribe the terms of its interference ; and he who seeks equity at its hands, may well be required to do equity. And it is against conscience, that the party should have full relief, and at the same time pocket the money loaned, which may have been granted at the debtor's own mere solicitation. For then a statute made to prevent fraud, would be made the instrument of fraud. But in the other case, if Equity should relieve the lender, who is *plaintiff*, it would be aiding a wrong-doer, who is seeking to make the Court the means of carrying into effect, a transaction manifestly wrong and illegal in itself. 1 *Story's Eq. Jurisp.* §301.

In *Scott vs. Nisbet*, Lord Thurlow, acting upon the foregoing distinction which is broad and palpable, ruled that the usurious judgment should stand for the money actually loaned, with legal interest. And this we deem to be just upon general principles. But there is another reason why this should be done in the present case. But for the agreement on the day of sale, Walker could have enforced his judgment and possibly realized the whole of his money. At any rate, had he been forced into equity, by an original bill filed, either by Hines himself or the assignees—the principal and legal interest due upon the debt would have to have been paid. Under the facts and circumstances of this case, we cannot let them into this defence, upon terms less advantageous to the creditor. For while it is true that the promise and undertaking of the Trustees, made before notified of the usury, can be considered as extending only to so much of Walker's debt as was legally and properly due ; still, we feel it would be unjust to place this creditor on a worse footing than he would have occupied, had the assurance not been given that he should have his money.

And I would barely add, that the doctrine here decided does not conflict with any previous opinion of this Court. While *at law* the creditor in a usurious contract can only *recover* his *principal* under the Act of 1820, and *no more,* I have yet to learn that a borrower seeking relief in equity, will be required to do *less* un-

der this Statute, which forfeits the *interest only*, than under the old law, which not only declared the *whole* contract *void*, but annexed a forfeiture of double the value of the thing loaned.

This cause came before the Court upon a transcript of the record from the Superior Court of Bibb County, and after argument had thereon, it is ordered and adjudged, that the judgment below be reversed, upon the ground that the Court erred in refusing to permit an inquiry to be instituted as to the usury, alleged to exist in the judgment, it being the opinion of this Court that a proper case is made by the answer of the defendants to the creditor's Bill, to authorize such inquiry; and that if the defence is sustained by proof, that the judgment of Walker can only stand good in the distribution of the *trust fund*, for the amount of principal and legal interest remaining due thereon, after deducting whatever payments have been made to the creditor.